UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| DONITA EPLING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-02-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| AMERICAN UNITED LIFE | ) | **AND ORDER** |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Donita Epling brings this action pursuant to the Employment Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, against Defendant American United Life Insurance Company. She seeks to recover long-term disability benefits (LTD Benefits) under a Group Policy (the Policy) issued to her employer, Pikeville Medical Center. Defendant denied the LTD Benefits on the basis that she was not disabled under the terms of the Policy. Presently pending before the Court is Plaintiff's Motion for Judgment Overturning Administrative Decision, R. 16, to which a response, R. 23, has been filed. The Court concludes that Defendant incorrectly denied Plaintiff LTD Benefits and thus reverses Defendant's administrative decision.

I. **INTRODUCTION**

A. **Policy Provisions**

Under the Policy, Plaintiff is entitled to LTD Benefits if she is totally disabled after the elimination period,[1] *see* Admin. R. at 26, which is a period of 90 consecutive days of disability,

---

[1] It also appears that the Policy provides for LTD Benefits if a person is partially disabled, but Plaintiff does not claim partial disability, only total disability.

beginning on the first day of the disability, *see id.* at 7, 10.  Total disability means that, because of injury or sickness: (1) the insured cannot perform the material and substantial duties of her regular occupation; and (2) after benefits have been paid for 24 months, the insured cannot perform the material and substantial duties of any gainful occupation for which she is reasonably fitted by training, education or experience.  *Id.* at 15.  The maximum time for which Plaintiff can receive benefits is five years.  *See id.* at 8; R. 16, Mem. in Supp. at 8.

Thus, for Plaintiff to be eligible for LTD Benefits for the first 24 months following the elimination period (which would be March 20, 2006, given Plaintiff's claimed disability date of December 20, 2005, *see* Admin.. R. at 565), she must be unable to perform the material and substantial duties of her regular occupation.  For up to three years following this initial 24-month period, Plaintiff would be eligible for LTD Benefits only if she is unable to perform the material and substantial duties of any gainful occupation.

### B.  Factual and Procedural Background

Plaintiff was the Medical Staff Coordinator for Pikeville Medical Center, where she had worked in various capacities since 1964.  During 2005, Plaintiff developed severe back pain and stopped working on December 19, 2005.  R. 16, Mem. in Supp. at 2.  She applied for disability benefits from the Social Security Administration (SSA), which found her disabled and granted benefits on February 10, 2007.  Admin. R. at 316.  Thereafter, on March 14, 2006, Plaintiff, at the age of 60, applied for LTD Benefits on the basis of "severe back pain."  *Id.* at 565.  Along with her application, Plaintiff submitted three Attending Physician Statements from her treating doctors, Dr. Akers, Dr. Puram, and Dr. Mettu.  *Id.* at 565–71, 576–77.  Dr. Akers indicated that Plaintiff was suffering from back pain, *id.* at 568, and stated that in an eight-hour day, Plaintiff could perform up

to six hours of sedentary work (lifting up to ten pounds, walking/standing on occasion, and sitting

six to eight hours) and two hours of light work (lifting up to twenty pounds and standing six to eight

hours), *id.* at 569. Dr. Puram noted that Plaintiff was suffering from chest and back pain. *Id.* at 570,

572, 574. He recommended that she not return to work pending a "cardiac work-up for symptoms."

*Id.* at 571. Dr. Mettu also noted Plaintiff was suffering from chest and back pain, *id.* at 576, but

deferred to Dr. Akers and Dr. Puram regarding her ability to return to work, *id.* at 577. On April 26,

2006, Disability RMS, the claims administrator for American United, advised Plaintiff that there was

insufficient documentation of a disability and informed her that her attending physician needed to

certify that she was "disabled from [her] regular occupation and provide restrictions and limitations

that preclude [her] from performing [her] regular occupation." *Id.* at 551. Dr. Akers responded on

May 11, 2006, concluding that Plaintiff is not "physically/medically capable of executing the

functions of her employment." *Id.* at 553. The basis for this conclusion was that Plaintiff may only

sit for 30-40 minutes at a time, *id.* at 554, but her job required her to sit for longer periods, *id.* at 553.

Dr. Puram also responded on May 11, 2006, and likewise concluded that Plaintiff was not "medically

capable of returning to work" because of the sitting requirements of her job. *Id.* at 547. In addition,

Dr. Puram noted that returning to work would be dangerous for Plaintiff because she had suffered

some disruption of her normal heart rhythms, which could lead to cardiac arrest, based on stress at

work. *Id.*

On May 12, 2006, Rita Lord, RN, a medical consultant for Disability RMS, concluded that

the "submitted medical information fails to provide clinical evidence that the claimant is precluded

from performing her usual daily personal and professional activities." *Id.* at 541. The consultant

did note, however, that the "work-related limitations provided by Dr. Akers of no sitting greater than

30 to 40 minutes and avoidance of lifting greater than 10 pounds above the head appear more reasonable and consistent with the clinical findings." *Id.*

On June 7, 2006, Nancy Nelson, MD, another medical consultant, conducted a review of Plaintiff's file and determined that additional information was needed to determine if she was disabled. Dr. Nelson stated, "[a]lthough she reports back and chest pain there is no evidence of objective testing to support a cardiovascular or musculoskeletal condition that would preclude sedentary work capacity." *Id.* at 536. As for Plaintiff's stress, Dr. Nelson noted, "[t]here is evidence suggesting that the claimant has anxiety, but no details or evaluation by a mental health provider." *Id.* Dr. Nelson recommended that additional information should be gathered, such as X-rays, blood work, a cardiac stress test, medical records from Dr. Akers, Dr. Puram, and Dr. Mettu, and contacting Plaintiff about her work stress. *Id.* By July 25, 2006, when Dr. Nelson conducted another file review, Dr. Puram and Dr. Mettu had provided lab notes and various test reports. *See id.* at 491. In addition, Dr. Akers had sent a letter to Disability RMS on June 28, 2006, indicating that Plaintiff was suffering from severe back pain and unable to perform her job functions or maintain any employment at all. *Id.* at 489. In her report, Dr. Nelson stated that though Dr. Akers has indicated that Plaintiff should avoid sitting for more than 30-40 minutes, "there is no objective evidence supporting that the claimant has a condition that would be exacerbated by prolonged sitting." *Id.* at 492. Regarding Plaintiff's stress and chest pain, Dr. Nelson likewise found "no objective evidence of a cardiac condition that would preclude sedentary functionality . . . ." *Id.* Thus, she concluded, "it remains unclear what about her job she is medically unable to do . . . ." *Id.* But Dr. Nelson also recommended gathering additional information about Plaintiff. *Id.* at 492–93.

On September 12, 2006, Dr. Nelson conducted another file review, and her conclusions

remained similar to her previous reports.  In particular, she stated, "[a]lthough the claimant's complaints of low back pain are not in dispute, her symptoms and duration of complaints exceed findings on physical exam and objective findings on lumbar MRI."  *Id.* at 392.  Thus, Dr. Nelson reported that Plaintiff had the ability to do sedentary work in spite of her complaints.  *Id.* at 392.  Dr. Nelson also noted the absence of medical evidence regarding Plaintiff's anxiety or stress.  *Id.*

On September 29, 2006, Dr. Nelson had a telephone conversation with Dr. Akers regarding Plaintiff, which Dr. Nelson summarized in a letter to Dr. Akers.  *See id.* at 387–88.  According to Dr. Nelson's letter, Dr. Akers agreed that as of February 23, 2006, Plaintiff's examinations had returned to normal and that her "pain complaints persisted and have subsequently consistently exceeded findings on physical examination."  *Id.* at 387.  Dr. Akers also allegedly expressed concern that Plaintiff "may have unspecified 'job issues' that are creating anxiety and reluctance to return to work."  *Id.* at 387.  While Dr. Akers perhaps agreed to the substance of this letter by not responding to it, *see id.* at 388 ("[I]f I do not hear from you within 7 business days . . . I will assume you are in agreement with the contents of this letter."), his alleged comments during the phone conversation directly conflict with the letters he sent to Disability RMS on May 11, 2006, and June 28, 2006, indicating that Plaintiff was experiencing severe back pain and unable to return to work.

On October 12, 2006, Disability RMS informed Plaintiff that it was denying her claim.  *See id.* at 333–36.  Based on Plaintiff's medical files, the letter referenced three possible medical conditions and rejected all of them as a disability under the terms of the Policy.  First, with respect to the back pain, the letter indicated that any restrictions she had as a result of the back pain had been eliminated by March 20, 2006, the first day Plaintiff would have been eligible for LTD Benefits based on the date she alleged her disability began, December 20, 2006.  *Id.* at 335.  Regarding her

heart condition and stress, the letter indicated there was insufficient medical evidence to support any restrictions on either basis. *Id.*

Plaintiff appealed this decision on February 26, 2007. *Id.* at 315. Plaintiff attached various medical records from her treating physicians to her appeal letter, including notes of visits to Dr. Akers on November 2, 2006, and February 1, 2007. In the notes from the November visit, Dr. Akers stated that, at that time, he did not believe Plaintiff would ever be able to return to work. *Id.* at 320. Dr. Akers repeated that conclusion at the February visit, stating that Plaintiff would never be able to return to work in any capacity. *Id.* at 317. Plaintiff also attached a letter dated October 24, 2006, from Dr. Gutti stating that Plaintiff does not have the physical capacity to return to the type of work she was performing. *Id.* at 322.

On April 17, 2007, Thomas Reeder, MD, a medical consultant, reviewed Plaintiff's medical file and prepared a report of his findings. *See id.* at 207–215. Dr. Reeder found "no evidence of any condition that would limit sustained work capacity," though he also concluded that a reasonable limitation on her work activities would include the ability to change position. *Id.* at 214.

On May 14, 2007, Elizabeth Roaf, MD, another medical consultant, prepared a report on Plaintiff's medical file. *See id.* at 168–79. She concluded that "the insured does not appear to be precluded from full-time sustained work activity with restrictions of no prolonged standing, and no prolonged sitting with position changes every 30 minutes to one hour as needed." *Id.* at 178. With such work restrictions in place, Dr. Roaf believed that "the insured does not appear to be precluded from full-time sedentary work activity based on her musculoskeletal conditions." *Id.* On May 15, 2007, after Dr. Roaf had prepared her report, Plaintiff's cardiologist, Dr. Puram, sent a letter to Dr. Roaf stating, "Mrs. Epling's cardiac condition renders her incapable of returning to work and makes

any attempt to do so potentially dangerous." *Id.* at 186.  On May 31, 2007, a medical consultant with a specialty in cardiology, Jerry DiDonna, MD, prepared a report on Plaintiff's medical file.  *See id.* at 157–162.  He concluded there was "no evidence of any cardiac impairment diagnosed." *Id.* at 162. For this reason, Dr. DiDonna stated that Plaintiff was able to perform the type of full-time work she had been performing prior to the date of her alleged disability.  *Id.*  On June 21, 2007, Dr. Gutti, another of Plaintiff's treating physicians, sent a letter to Dr. Roaf stating that Plaintiff had "facet arthritis and joint effusions . . . in the lumbar spine, as well as disc degenerations and protrusions of disc material in the upper lumbar spine." *Id.* at 135.  Based on these conditions, Dr. Gutti concluded that he did "not believe Ms. Epling can participate in any gainful employment" and that she is permanently disabled.  *Id.*

On August 10, 2007, Disability RMS denied Plaintiff's appeal.  *See id.* at 89–92.  The denial letter indicated that Plaintiff was "able to perform the physical duties of the occupation," *id.* at 91, and thus she was not disabled under the terms of the Policy.

## II.   STANDARD OF REVIEW

In an ERISA-governed benefits action, the Court initially must determine the applicable standard of review—either arbitrary and capricious or *de novo*—based upon the language in the Plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The parties have stipulated that the appropriate standard of review in this matter is *de novo*.  *See* R. 13.

In conducting a *de novo* review, the Court's role is to determine whether the administrator made a correct decision.  *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002) (quoting *Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 967 (6th Cir. 1990).  In doing so, the Court will take a "fresh look" at the administrative record, *Wilkins*

*v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998), and review the administrator's decision "without deference to the decision or any presumption of correctness, based on the record before the administrator," *Perry*, 900 F.2d at 966.

### III.   PLAINTIFF'S ENTITLEMENT TO LTD BENEFITS

Defendant denied LTD Benefits to Plaintiff because it concluded she was able to perform the material and substantial duties of her occupation as of March 20, 2006. Plaintiff challenges that decision and seeks the maximum five years of LTD Benefits. To receive those benefits under the Policy, Plaintiff must: (1) be unable to perform the material and substantial duties of her regular occupation for the first 24 months following the elimination period and (2) be unable to perform the material and substantial duties of any gainful occupation for the three years following this initial 24-month period. After examining the Administrative Record, the Court concludes that Plaintiff is entitled to LTD Benefits.

Three of Plaintiff's treating physicians stated that she was not capable of performing her job and/or any job.

***Dr. Akers.*** On May 11, 2006, Dr. Akers, a rehabilitation physician with the Tri-State Sports & Rehabilitation Center in Pikeville, Kentucky, informed Disability RMS that Plaintiff was not "physically/medically capable of executing the functions of her employment" based on her back pain, which is precipitated by periods of sitting. Admin. R. at 553. In response to inquiries from Disability RMS, Dr. Akers reiterated this position in a June 28, 2006, letter. Dr. Akers indicated that he had been treating Plaintiff for eight months for "severe back pain complicated by spasms." *Id*. at 489. Again based on her back pain, he stated, "Mrs. Epling is simply not currently able to maintain employment. . . . Although it took some time for her to reveal sufficient information for

me to come to this conclusion, I am now confident of her complete disability." *Id.* In support, Dr. Akers attached copies of Plaintiff's office visits and MRI of her lumbar spine. *Id.* In the months following the June letter, Dr. Akers continued to recommend that Plaintiff not return to work. In Dr. Akers's notes from the November 2006 visit, he indicated that Plaintiff would never be able to return to work, *id.* at 320, and in notes from a February 2007 visit, he similarly recommended that she not ever return to work in any capacity, *id.* at 317. Based on Dr. Nelson's summary of her conversation with Dr. Akers, Defendant contends that even Dr. Akers admits that Plaintiff did not have a disability as of March 20, 2006. *See* R. 23 at 17. It is true that Dr. Nelson alleges that Dr. Akers told her that as of February 23, 2006, Plaintiff's examination had returned to normal and that her "pain complaints persisted and have subsequently consistently exceeded findings on physical examination," Admin. R. at 387, and that Dr. Akers failed to make any corrections to the letter as requested, *id.* at 388. But the statements Dr. Nelson attributes to Dr. Akers stand in such marked contrast to Dr. Akers's actual statements (as evidenced in his own letters and office notes) that the Court cannot but help to question the accuracy of Dr. Nelson's summary of the conversation. For this reason, the Court will credit Dr. Akers's own words rather than the words attributed to him by Dr. Nelson. Under this view of the evidence, it is clear that Dr. Akers believed Plaintiff was unable to return to any employment because of her back pain.[2]

   ***Dr. Gutti.*** On October 24, 2006, Dr. Gutti, a pain management specialist with the Pain Management Center in Pikeville, Kentucky, opined that Plaintiff did not have the physical capacity

---

[2] While Dr. Akers found that as of May 11, 2006, Plaintiff could work with certain restrictions, *see* Admin. R. at 553–54, it is apparent that he viewed Plaintiff's back condition as worsening because by November 2006 and continuing in February 2007, Dr. Akers indicated that Plaintiff would never be able to return to work. *Id.* at 317, 320.

to return to the type of work she had previously performed. *Id.* at 322. Subsequently, Dr. Gutti spoke to Dr. Roaf regarding his treatment of Plaintiff. After speaking with Dr. Roaf, Dr. Gutti sent her a letter on June 21, 2007, to memorialize their conversation, stating that because of her ongoing pain he did "not believe Ms. Epling can participate in any gainful employment" and that she is "permanently disabled." *Id.* at 135. His conclusion was based on findings that she suffered from "facet arthritis and joint effusions . . . in the lumbar spine as well as disc degenerations and protrusions of disc material in the upper lumbar spine." *Id.*

***Dr. Puram*.** Dr. Puram is a cardiologist with Appalachian Cardiology in Pikeville, Kentucky, and on May 11, 2006, in response to inquiries from Disability RMS, he stated that Plaintiff was not medically capable of returning to work. *Id.* at 547. The basis for this conclusion was her significant pain and heart condition. *Id.* Dr. Puram believed that Plaintiff had suffered "some disruption of her normal heart rhythms . . . [that] could certainly produce a full-blown cardiac arrest in Mrs. Epling, which very well may be fatal." *Id.* On May 15, 2007, after having a conversation with Dr. Roaf, Dr. Puram reiterated his position. *See id.* at 186. He stated that he had reviewed an office note from Dr. Gutti indicating that Plaintiff could not return to work because of her back and concurred with that opinion. *Id.* With respect to her heart condition, he stated that it "renders her incapable of returning to work and makes any attempt to do so potentially dangerous." *Id.*

In summary, Dr. Akers, Dr. Gutti, and Dr. Puram believed that Plaintiff could not perform any type of work because of her back pain, while Dr. Puram indicated that Plaintiff's heart condition also precluded her return to work. Defendant's medical consultants, of course, disagree with Plaintiff's treating physicians. Under an arbitrary and capricious review, "when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether

-10-

a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). But under the *de novo* review applicable in this case, such deference does not apply. Indeed, the Sixth Circuit, applying a *de novo* review, affirmed a district court's reversal of a plan administrator's denial of benefits because "[t]he evidence presented in the administrative record did not support the denial of benefits when only Provident's physicians, who had not examined [the insured employee], disagreed with the treating physicians." *Hoover v. Provident Life & Accident Insurance Co.*, 290 F.3d 801, 809 (6th Cir. 2002).

Here, the medical consultants' primary concern was the alleged lack of objective evidence supporting Plaintiff's claims of disability. *See* Admin. R. at 541, 536, 492, 392, & 213–14. The Administrative Record, however, refutes this concern. There are statements by Dr. Akers, Dr. Puram, and Dr. Gutti, as described above, which are based on repeated physical examinations of Plaintiff and supported by their corresponding office notes from the visits, *see id.* at 460–62 & 317–320 for Dr. Akers's notes, *id.* at 572–75, 503–11 & 498 for Dr. Puram's notes, *id.* at 321–22 & 275–77 for Dr. Gutti's notes. Additionally, there are medical tests in the record as well. For example, an MRI was taken of Plaintiff that shows mild degenerative changes. *Id.* at 458. Dr. Nelson acknowledged the MRI but discredited it because she did not believe it justified Plaintiff's complaints of pain, *see id.* at 392 ("Although the claimant's complaints of low back pain are not in dispute, her symptoms and duration of complaints exceed findings on physical exam and objective findings on lumbar MRI."), which, as noted below, is a credibility determination that is quite difficult to make based solely on a file review.

In addition to the objective evidence undermining Defendant's position, several factors exist

to support discounting the opinions of its medical consultants.  Specifically, the Court concludes that the failure of Defendant's medical consultants to conduct a physical examination of Plaintiff, to reconcile the opinions and conclusions of Plaintiff's three treating physicians, and to distinguish the SSA determination that Plaintiff was totally disabled weigh in favor of reversal.

### 1.  Lack of Physical Examination

The medical consultants conducted only a file review of Plaintiff rather than a physical examination, in spite of Defendant's right to order Plaintiff to submit to such an examination, *see id.* at 24 ("AUL, at its own expense, has the right to have a Person examined to determine the existence of any Disability that is the basis for a claim.").  The Sixth Circuit has indicated there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).  However, the *Calvert* panel also stated that "the failure to conduct a physical examination–especially where the right to do so is specifically reserved in the plan–may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *id.* at 295; *see also Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006)).  Indeed, in reversing the administrator's denial of benefits as arbitrary and capricious, *Calvert* relied on the inadequacy of the file review, which it found inadequate because, among other reasons, the doctor reviewing plaintiff's medical file "never addresse[d] head-on and simply seemed to ignore" contrary conclusions about plaintiff's functioning capacity.  *Calvert*, 409 F.3d at 296–97; *see also Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 510–11 (6th Cir. 2005) (reversing the administrator's decision as arbitrary and capricious after finding a file review inadequate because, among other reasons, it failed to rebut the contrary medical

conclusions reached by plaintiff's treating physician).

## 2. Consideration of Treating Physicians Opinions

Here, the file review likewise is inadequate because Defendant and its medical consultants failed to reconcile their drastically different opinions with those of Plaintiff's three treating physicians.  For example, in its October 12, 2006 denial, Defendant did not even mention the letters from Dr. Akers (May 11, 2006, and June 28, 2006) or Dr. Puram (May 11, 2006) stating that Plaintiff was not capable of returning to work.  *See id.* at 333–36.  In its August 10, 2007, denial of Plaintiff's appeal, Defendant mentions Dr. Akers's letters from May and June and Dr. Gutti's recommendation for Plaintiff not to return to work, *see id.* at 89–90, but fails to reconcile these opinions with those of its medical consultants.  While both denials were premised on the medical consultants' reports, those too failed to reconcile their positions with Plaintiff's treating physicians.  *See id.* at 390–93 (Dr. Nelson concluding on September 12, 2006, that Plaintiff could perform sedentary work but not reconciling her position with Dr. Akers's May and June letters or Dr. Puram's May letter); *id.* at 168–74 (Dr. Roaf concluding on May 14, 2007, that Plaintiff could perform sedentary work with certain restrictions but not reconciling her position with the correspondence received from Dr. Akers and Dr. Gutti during the appeal).  While of course Defendant does not have to defer to the opinions of treating physicians, it is equally clear that a plan administrator may not disregard those opinions. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *see also Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006) ("While Van Bussum's opinion as Smiths' treating physician does not have to be afforded special deference by an ERISA plan administrator pursuant to the Supreme Court's holding in *Black & Decker Disability*

-13-

*Plan v. Nord*, neither can [the plan administrator] arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." (quotations omitted)). Essentially, on this record, the opinions of Plaintiff's treating physicians were effectively disregarded without explanation or reconciliation.

The file review is also inadequate because the medical consultants made important credibility determinations regarding Plaintiff's complaints of pain. For example, Dr. Nelson stated, "[a]lthough the claimant's complaints of low back pain are not in dispute, her symptoms and duration of complaints exceed findings on physical exam and objective findings on lumbar MRI." Admin. R. at 392. Similarly, Dr. Reeder stated, "[t]he claimant has reported low back pain for more than one year; however, on all occasions her neurological findings have been normal or revealed minimal abnormalities," and "[t]he claimant's back symptoms cannot be explained by these minimal [physical] findings." *Id.* at 213. But in cases where plan administrators make important credibility determinations regarding a claimant's medical history based solely on a file review, the Sixth Circuit has indicated that a file review may be inadequate. *See Calvert*, 409 F.3d at 297 n.6 (stating that while there is nothing inherently improper with relying on a file review, where "the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate"); *see also Houston v. Unum Life Ins. Co. of Am.*, 246 F. App'x 293, 302 (6th Cir. 2007) ("We also view Unum's ultimate reliance on Dr. Lipton's opinion with some skepticism because it was essentially 'a critical credibility determination' about Houston's complaints made without the benefit of a physical exam." (quoting *Calvert*, 409 F.3d at 297)); *Smith*, 450 F.3d at 263–64 (holding that a plan administrator's decision not to perform a physical examination supports a finding that its denial of benefits was arbitrary

-14-

where the file review made credibility findings regarding the plaintiff's pain without the benefit of an examination).

### 3. SSA determination

Another reason to discount Defendant's medical consultants is their failure to reconcile their positions with the SSA's determination that Plaintiff was totally disabled. *See Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006), *aff'd*, 128 S. Ct. 2343 (2008) ("That MetLife apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se*, but it is obviously a significant factor to be considered upon review."); *see also Calvert*, 409 F.3d at 295 (stating that the SSA's disability is a factor the court should consider, "in the context of the record as a whole, in determining whether Liberty's contrary decision was arbitrary and capricious").  Here, neither the October 12, 2006, denial letter, *see* Admin. R. 333–36, nor the August 10, 2007, appeal denial letter, *see id.* at 89–92, referenced the SSA's determination of total disability benefits, and it appears that only one of the medical consultants (Dr. Reeder, *see id.* at 207) even acknowledged it, though he did not reconcile his conclusion with that of the SSA.  This silence is particularly striking here because the Policy required Plaintiff to apply for Social Security benefits, *see id.* at 28, and Defendant's monthly benefit payments will be reduced by those benefits, *see id.* at 8, 26.  *See Bennett*, 514 F.3d at 554 (citing *Glenn*, 461 F.3d 669) ("[I]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.").  If a court may consider the plan administrator's failure to reconcile its position with

the SSA's determination in an arbitrary and capricious review, it follows that a court may also do so in a *de novo* review.  Thus, while the SSA's determination does not, standing alone, require a reversal of Defendant's denial of benefits, the determination along with Defendant's silence on the issue does weigh in favor of reversal.

Lastly, the conflict of interest on the part of both Defendant and the medical consultants should be considered.  *See Metropolitan Life Ins. Co. v. Glenn,* , --- U.S. ----, 128 S. Ct. 2343, 2351 (2008) ("[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."); *Kalish*, 419 F.3d at 508 ("[A]lthough 'routine deference to the opinion of a claimant's treating physician' is not warranted, we may consider whether 'a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled'" as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician." (quoting *Black & Decker Disability Plan*, 538 U.S. at 832)); *Calvert*, 409 F.3d at 292 (noting that a plan administrator has "a clear incentive to contract with individuals who were inclined to find in its favor that [the plaintiff] was not entitled to continued LTD benefits" and that such a conflict should be taken into account in determining whether the administrator's decision was arbitrary and capricious).  The Court recognizes that Plaintiff has offered only a conclusory allegation of bias that is not supported by any statistical evidence.  However, the conflict of interest present here, when coupled with the additional factors of the inadequate file review and the failure to address the SSA determination, further supports a reversal of Defendant's denial of benefits.

Based on the facts of this case, as evidenced in the Administrative Record, the Court concludes on a *de novo* review that the opinions of Plaintiff's three treating physicians, who

-16-

physically examined Plaintiff and treated her for her ongoing pain, are more credible than those of Defendant's medical consultants who solely engaged in a file review, failed to distinguish the opinions of the Plaintiff's treating physicians, and ignored the SSA determination.  Thus, the Court finds that, based on her back and heart conditions, Plaintiff is unable to perform the regular and substantial duties of her regular occupation and also the material and substantial duties of any gainful occupation.[3]  Accordingly, under the Policy, Plaintiff is totally disabled.

## IV.  REMEDY FOR IMPROPER DENIAL OF BENEFITS

Having determined that Defendant's decision to deny Plaintiff LTD Benefits was incorrect, the Court must determine the appropriate remedy.  The Court may either award benefits to Plaintiff or remand the matter to the plan administrator for further proceedings.  *Elliott v. Metro.Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) (citing *Smith*, 450 F.3d at 265).  In *Elliott*, the Sixth Circuit, adopting the holding in *Buffonge v. Prudential Insurance Co. of America*, 426 F.3d 20, 31–32 (1st Cir. 2005), where the First Circuit held that where the problem is with the integrity of the plan administrator's decision-making process rather than with a claimant being denied benefits to which she was clearly entitled, the appropriate remedy generally is remand to the plan administrator. *Elliott*, 473 F.3d at 622.  Indeed, courts "must have considerable discretion to craft a remedy after finding a mistake in the denial of benefits."  *Id*. (quoting *Buffonge*, 426 F.3d at 31–32).  Here, Plaintiff currently is unable to perform the regular and substantial duties of her regular occupation or any gainful occupation.  Thus, Plaintiff is totally disabled and is clearly entitled to some amount of LTD Benefits under the Policy.

---

[3] Because Plaintiff is unable to perform the duties of her regular occupation, Defendant's Labor Market Survey, *see* Admin. R. at 136–42, showing the availability of positions for medical staff coordinators is of no significance.

Plaintiff provided a computation of her LTD Benefits under the Policy for the maximum five years, which extends into the coming years. *See* R. 16, Mem. in Supp. at 9. Given its argument that Plaintiff was not entitled to LTD Benefits as an initial matter, Defendant did not address this computation in its response. The Court will give Defendant a limited period to challenge this computation. If it does not respond, the Court will assume Defendant accepts Plaintiff's calculation, and the Court will enter judgment accordingly.

## V. CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1)    Plaintiff's Motion for Judgment Overturning Administrative Decision, R. 16, is **GRANTED**.

(2)    Defendant may challenge Plaintiff's computation of LTD Benefits by February 20, 2009.

This the 20th day of January, 2009.



Signed By:

*Amul R. Thapar*

**United States District Judge**

-18-